# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 18-7V
Filed: June 24, 2025

```
*  *  *  *  *  *  *  *  *  *  *  *  *  *
NEENA HARTSHORN,                         *
                                         *
                                         *
                Petitioner,              *
v.                                       *
                                         *
SECRETARY OF HEALTH                      *
AND HUMAN SERVICES,                      *
                                         *
                Respondent.              *
                                         *
*  *  *  *  *  *  *  *  *  *  *  *  *  *
```

*Bruce W. Slane, Esq.*, The Law Office of Bruce W. Slane. P.C., White Plains, NY, for petitioner.
*Jay T. Williamson, Esq.*, U.S. Department of Justice, Washington, DC, for respondent.

## FINDINGS OF FACT[1]

**Roth**, Special Master:

      On January 2, 2018, Neena Hartshorn ("Ms. Hartshorn" or "petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10 *et seq*.[2] ("Vaccine Act" or "the Program"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA"), rotator cuff tendinitis, bicep tendinitis, infraspinatus and supraspinatus tendinitis, impingement syndrome and bursitis of the left shoulder caused by the adverse effects of an influenza vaccination and/or administration thereof received on November 21, 2013.[3] Petition at 1, ECF No. 1.

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the Ruling will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), the parties have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. Any changes will appear in the document posted on the website.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

[3] Petitioner initially alleged that subsequent vaccinations significantly aggravated the injury she allegedly sustained on November 21, 2013. The significant aggravation claims were later waived. Tr. 4, 70, 117-19.

Petitioner keeps journals of her activities of daily living, physical conditions, illnesses, pain, interactions with others, feelings and relationships. Her journals, in combination with the contemporaneous medical records, provide preponderant evidence of the following: petitioner received a flu vaccine on November 21, 2013, developed an infection at the vaccination site on or about December 3, 2013 which temporarily caused pain and an inability to move her left arm, was treated with antibiotics and prednisone with resolution of the infection and return of full mobility of her left arm. Thereafter, intermittently and on rare occasions, she experienced left arm pain at the vaccination site that did not affect her activities of daily living but continued for a few years. The evidence contained in her journals and the medical records refute any claims of aggravation of left arm pain following two subsequent flu vaccines on September 10, 2014 and October 14, 2015. Had her counsel reviewed and produced the complete journals and medical records prior to the hearing, the issues in this case could have been quickly resolved without a hearing and a detailed Ruling. Tr. 221-34.

For the reasons set forth below, I find the onset of petitioner's left arm pain was on or about December 3, 2013. An expert is necessary to determine whether petitioner had a definable injury that satisfies the six-month severity requirement. Petitioner's SIRVA claim is dismissed for the reasons set forth below.

## I.    Procedural History

The petition was filed on January 2, 2018[4] and was initially assigned to the Special Processing Unit ("SPU"). *See* Petition, ECF Nos. 1, 5. Petitioner filed medical records and affidavits on January 22, 2018. Petitioner's Exhibits ("Pet. Ex.") 1-9, ECF No. 7.

Respondent filed his Rule 4(c) Report ("Resp. Rpt") on December 19, 2018, arguing that this was not an on-Table SIRVA claim. Resp. Rpt at 1, ECF No. 19.

The matter was reassigned to me on March 18, 2019. ECF No. 21. During a status conference held on June 26, 2019, significant gaps in the medical record were discussed along with issues involving onset and the severity requirement. ECF No. 22. Respondent's counsel raised reasonable basis in proceeding with the claim based on the filings. *Id.* at 7. Petitioner was ordered to file a status report on how she intended to proceed and/or additional medical records. *Id.* at 8.

Petitioner filed medical records on August 19, 2019 and August 27, 2019. Pet. Ex. 10-14, ECF Nos. 23, 25. In a status report filed on August 27, 2019, petitioner confirmed the filing of all

---

[4] On March 21, 2017, the Vaccine Injury Table was amended. The changes included the addition of SIRVA as a presumptive injury for intramuscularly injected vaccines if, among other conditions, the first symptom or manifestation of onset of the condition occurs within forty-eight hours of vaccination. *See* 42 C.F.R. § 100.3(a)(XIV)(B). As stated in the Table's qualifications and aids to interpretation ("QAI"), "SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm." 42 C.F.R § 100.3(c)(10). The amended Table governs petitions filed on or after March 21, 2017, the effective date of the final rule. 42 C.F.R. § 100.3(e)(1); 82 Fed. Reg. 11321 (Feb. 22, 2017) (announcing "that the effective date is delayed until March 21, 2017"). Petitioner's claim here was filed within the 8-year look-back period that applies when the Vaccine Injury Table is amended. § 16(b).

requested medical records and argued that good faith and reasonable basis existed for proceeding with the claim. She requested a fact hearing. ECF No. 27. Respondent was ordered to file a status report indicating whether he would be willing to participate in a fact hearing.

In his status report filed on October 11, 2019, respondent repeated the various issues raised in his Rule 4(c) Report, questioned whether a fact hearing would be appropriate based on the record, and again raised the lack of reasonable basis for the claims. However, he indicated that he would participate in a fact hearing. ECF No. 28.

At a status conference held on December 9, 2019, the parties were advised that the hearing would address both onset and the severity requirement. Petitioner's counsel advised that petitioner kept a journal, and relevant portions would be filed. The parties were ordered to file a joint status report proposing dates for a fact hearing in May 2021 and petitioner was ordered to file her journal entries. ECF No. 31. A fact hearing was ultimately set for May 4, 2021. ECF No. 33.

On February 7, 2020, petitioner filed 1,704 pages of journal entries purportedly from 2010 through 2015. Pet. Ex. 16, ECF No. 34. Given the magnitude of information filed without accompanying explanation, petitioner was ordered to file a status report referencing which journal entries were relevant to petitioner's claim. ECF No. 37.

Petitioner filed a status report on May 11, 2020. Of the 1,704 pages of journals filed, petitioner referenced three journal entries as relevant to her alleged injury. ECF No. 38. Respondent filed a status report on June 17, 2020 advising that his position in this case had not changed. ECF No. 40. The fact hearing was held virtually on May 4, 2021.

Following the hearing, an Order issued for the filing of photographs of petitioner's alleged scar on her left arm from the infection following her November 21, 2013 flu vaccine and of her left arm being smaller than her right. Also ordered were all internet searches she conducted on SIRVA and the Vaccine Injury Compensation Program after seeing an advertisement on television. The Order again addressed the gaps in petitioner's medical records; gaps in petitioner's journals; and that the records from Dr. Minor remained outstanding despite being ordered previously. Finally, the Order addressed entries in the journals that had been filed which discussed motor vehicle accidents petitioner had been involved in between 2010 to 2014. Based on the foregoing, petitioner was ordered to file all journals from August 2014 through December 2014 and February 2015 through present; all medical records from 2010 to present, including records from Dr. Minor; all insurance claims for motor vehicle accidents between 2010 to present; and her application and finding for disability benefits. ECF No. 48.

On December 14, 2021, petitioner filed journals from 2014 through 2021, photographs, an affidavit from her son regarding internet searches,[5] insurance records, and additional medical records. Pet. Ex. 17-30, ECF Nos. 56-58. She later filed a supplemental affidavit stating she has never applied for disability benefits. Pet. Ex. 31, ECF No. 61.

---

[5] Petitioner's son Brennon affirmed that petitioner used her husband's work computer from 2013 through 2015, which was returned once he left his position. Further, he affirmed reviewing petitioner's computer history and advised that it only goes back 90 days. Pet. Ex. 20.

The matter is now ripe for a Fact Ruling.

## II.    Factual Record

Typically, a petitioner's medical records provide the bulk of the factual record in a vaccine case, often supplemented by later testimony. This case is unique in that this petitioner kept a detailed personal record in the form of journals, which she referred to as "a log of events. of circumstances + occurrences in [her] life". Pet. Ex. 17 at 864. Petitioner filed over 5,700 pages of journals, with over 4,000 pages filed **after** the fact hearing. Petitioner's journals document her life in detail—almost daily—and include everything from her physical and mental state, her desires, her dreams, her fears, her interactions with others, details of her medical visits, and more. Throughout her journal, she described various symptoms, pain, and daily activities or disabilities in the same manner one would report to a physician or nurse during the course of treatment. It is clear that petitioner's journal was never meant to be read by anyone apart from herself,[6] and therefore the journal is a particularly persuasive account of her condition in the days and months following the subject vaccination relevant to the issues presently before this Court.

Due to the public nature of rulings and decisions in the Vaccine Program, an attempt was made to include only the details necessary to address petitioner's alleged left arm injury, complaints, and other contributing events and conditions. Most of what is contained in her journals is irrelevant to the issues before the Court and is therefore not discussed herein. The following summary of petitioner's medical history focuses on the timeframe at issue, as well as when petitioner noted left arm pain in the years that followed by way of journal entries.

### A.  Petitioner's Pre-Vaccination Medical History[7]

Petitioner has a history of cervicalgia; osteoarthritis of the cervical spine with bilateral shoulder pain; back, hip, and knee pain; chronic fatigue; sleep disorder; spinal pain from past motor vehicle accidents; headaches; and allergies. Pet. Ex. 13 at 12; Pet. Ex. 22; Pet. Ex. 27[8] at 13-14, 20-21, 196-97, 209-10.

On April 15, 2010, petitioner presented to her PCP following a motor vehicle accident that caused pain in her back and both shoulders. Pet. Ex 27 at 196. She returned to the PCP on April 16, 2010 reporting neck and scapular pain without weakness. Pet. Ex. 13 at 41, 44. The impression was cervicalgia and deteriorating osteoarthritis. *Id*. at 44-45.

---

[6] Petitioner even wrote at one point that "some of this I am writing <u>should</u> <u>not</u> be read by other people." Pet. Ex. 17 at 134 (emphasis in original).

[7] Prior to vaccination, petitioner journaled about her ongoing problems with head and neck pain, headaches, ear ringing and pain, left jaw pain, right hip pain, weakness, several near falls, arm pain and weakness, "crippling arthritis", pain in her hands, URIs, acid reflux, and hurting her back in October 2013. Pet. Ex. 16 at 175-76, 338, 379, 390, 394, 523, 555, 583, 925, 996, 997, 1005, 1008, 1011-12, 1022, 1030-31, 1035, 1051, 1169, 1190, 1208-120, 1232-1233, 1235, 1280, 1328, 1329, 1330-31. Her journal also described two car accidents prior to vaccination. *Id*. at 949, 956-57.

[8] Exhibit 27 is a more comprehensive record of petitioner's PCP's file than is Exhibit 2 or 3; thus, most of the citations for the PCP records are to Exhibit 27.

Petitioner was treated by Dr. Minor, a chiropractor, for many years. Between May and October 2010, Dr. Minor treated petitioner for cervical whiplash/sprain strain. She had ongoing complaints of pain in her cervical and lumbar spine, shoulders, left anterior forearm, left posterior forearm, and hips, all of which were better with treatment and worse with activity. Her "[o]rthopedic testing revealed Foraminal Compression Test was positive and Shoulder Depression Test was positive", relating her shoulder and arm complaints to her cervical spine issues. *See generally* Pet. Ex. 22 at 25-59.

Chiropractic treatment from April 2011 to June 2011 focused on her "cervical, hip, lumbar, pelvic and shoulder regions." She also reported tension headaches with associated neck pain. Shoulder depression tests were routinely positive and associated with her cervical spine issues.[9] Pet. Ex. 22 at 60-80.

At an annual PCP visit with Dr. Buie on March 28, 2013, petitioner complained of a host of issues including but not limited to fatigue, ringing in her ears, ear pain, decreased hearing, joint pain, stiffness, arthritis, headaches, and seasonal allergies. Pet. Ex. 27 at 140-42. She received Pneumovax and seasonal flu vaccinations in her left deltoid. *Id*. at 147.

On July 19, 2013, petitioner presented to her PCP with complaints of a rash on and off for two years. Pet. Ex. 27 at 317-19. The assessment was eczema and dysuria, and she was prescribed Hydrocortisone and Augmentin. *Id*. at 319. On July 23, 2013, she wrote in her journal about another UTI and problems associated with use of an estrogen patch. Pet. Ex. 16 at 1331-32, 1334-35.

She returned to chiropractic treatment from August of 2013 through the end of October 2013 for tension headaches and complaints related to her neck, upper back, lower back, and left hip.[10] Pet. Ex. 22 at 81-101.

Petitioner presented to her PCP for cough, congestion, earache, sore throat, and fever on October 31, 2013. Pet. Ex. 13 at 81-84.

Petitioner received the subject flu vaccination in her left arm on November 21, 2013. Pet. Ex. 2 at 74-75.

**B. Petitioner's Post-Vaccination Medical History**

On November 27, 2013, petitioner wrote in her journal about a Thanksgiving dinner held at her church the night before. There was no mention of her flu vaccination, or any arm pain or any untoward events associated with the vaccination. In early December 2013, she wrote about church, her husband and his health, and her various errands. Pet. Ex. 16 at 1074-79.

Twelve days post-vaccination, on December 3, 2013, petitioner called the PCP's office to report "issues w/flu shot site," including scabbing and drainage at the injection site with throbbing

---

[9] There are gaps in Dr. Minor's records. *See generally* Pet. Ex. 22.
[10] There is a gap in Dr. Minor's records between October 29, 2013 and July 7, 2015. Pet. Ex. 22 at 101-04.

and achiness. Pet. Ex. 2 at 179. Based on her complaints, she was prescribed Keflex. *Id*. She did not visit the provider in person. *Id*.

Throughout the remainder of December 2013, petitioner journaled about daily events including her children, grandchildren, "thoroughly" cleaning her house, practicing instruments, and visiting her mother. Pet. Ex. 16 at 1080-1100. Her journal entry for December 31, 2013 included "my left arm is shaking. I had a bad reaction to a flu shot. The site was oozing at first. Called Doc - gave info. He prescribed antibiotic – Cephalexin. Then, about 3 days after I finished it the arm became sore again. No oozing, but throbbing pain + hard to lift + raise my arm up. So…Doctor Buie prescribed prednisone and said if not better, make an appointment to see him." *Id*. at 1100-01. No appointment was made. Thereafter, petitioner journaled about her daily life and a fall while ice skating on January 3, 2014. There were no further writings about the flu vaccination or left arm pain at that time. *Id*. at 1101-07.

She presented to the PCP on January 7, 2014 due to difficulty breathing and rib pain from a fall while ice-skating. Pet. Ex. 27 at 267. The medical record documents that petitioner fell while ice-skating on Friday, injured her left rib area, slept most of the prior day, was taking Tylenol, struggled to breathe or laugh, and bruised her knee. The only mention of her arm was that "she has had problems" but does not go into any details. *Id*. There was no evidence of rib fracture on x-ray, and Tramadol was prescribed. *Id*. at 269. Petitioner journaled about this visit. She wrote about watching her grandchildren that day as well. Pet. Ex. 16 at 1107-08.

Petitioner called the PCP's office on January 13, 2014 and January 16, 2014 to report side effects from the medication, flu-like symptoms, and concern for another UTI. Pet. Ex. 13 at 174, 176. She was prescribed prednisone and Macrodantin. *Id*.

On January 25, 2014, petitioner wrote in her journal about how many times she had taken prednisone recently for her rib injury and "for flu shot reaction". Pet. Ex. 16 at 1117. Journal entries for the next several weeks included life events, ongoing rib pain that had her bed-ridden and limited her activities, being sick with a cold, tired, with hands throbbing with pain. *Id*. at 1108-36. On February 26, 2014, petitioner wrote about right ear pain that affected her right "neck and sometimes shoulders. Left side in particular. Left arm aching again near shot site. This from flu shot 4 months ago." *Id*. at 1136.

Petitioner presented for medical care on February 27, 2014 reporting right ear pain, headache, and left arm soreness and throbbing on and off since she received the flu vaccine in November of 2013. Pet. Ex. 13 at 177-78. Examination of her left arm and shoulder was "unremarkable", strength was appropriate, reassurance was given, she was told to use heat vs ice modalities, and to take NSAIDs as needed. If not better in one month, she was to follow up. *Id*. at 180. She wrote in her journal that the doctor thought her earaches and headaches were sinusitis and told her to hydrate and "use heat pad on left, arm. wait another month on arm + if still having a problem contact again." Pet. Ex. 16 at 1142-46.

Her journal entries from March through June 2014 detail sharp pain on right side of abdomen; exercise; right foot hurts and throbbing, right neck and ear hurting again; babysat grandkids; cleaned, did laundry; feel better after losing weight; left pinky arthritis pain; going to

6

the park with grandchildren; and doing landscaping like trimming the hedges. Pet. Ex. 16 at 1147, 1156, 1166, 1540, 1547, 1566, 1582, 1584, 1588, 1631. Specifically, on April 7, 2014, she wrote "my left arm hurt[s]. I was breathing hard." *Id*. at 1565.

Petitioner presented for a physical on June 23, 2014. Pet. Ex. 27 at 302-08. She complained of chills, ringing in her ears, rash, anxiety, and depression. *Id*. There was no left arm complaint.

Though the specific date is not legible, petitioner wrote in her journal in early July 2014 "left arm hurts." Pet. Ex. 16 at 1648. Journal entries for July and August of 2014 also include: right ear hurting again, reflux, swept deck and put out furniture, eczema flareup, cleaned house, took care of and played with grandkids, mowed the lawn, moved bricks, cleaned, vacuumed, played piano, chest pain likely from bad reflux, swept grass, emptied garbage, swept kitchen floor, cooked, did dishes, practiced flute and piano, bug bites, mowed lawn, babysat grandchildren including a newborn, earaches, headaches, emptied trash, swept kitchen, hemmed skirt, stomach hurts, exhausted, chest hurts, don't feel well at all, pretty sick, dizzy, lightheaded, headache, took aspirin. *Id*. at 1639, 1641, 1643-44, 1659, 1684-85, 1690, 1692; Pet. Ex. 17 at 3, 4-6, 8, 10-16, 25.

Petitioner presented to the PCP on September 4, 2014 complaining of chest pain, fatigue, hoarseness, sinus congestion, shortness of breath with exertion, cough, nausea, heartburn, back pain, and rash. Pet. Ex. 27 at 165-68. The assessment included gastroesophageal reflux disease ("GERD"), eczema, and osteoarthritis. *Id*. at 168-69. There was no complaint of left arm pain.

Petitioner returned to her PCP on September 10, 2014 reporting rash and burning on her neck. Pet. Ex. 27 at 29. Her chest pain and cough were improving, but she still had congestion and a rash on her left supraclavicular area. *Id*. at 30-31. Her history included chronic degenerative arthritic pain, diminished concentration, and lack of stamina and energy. *Id*. at 29. There was no mention of left shoulder or arm pain. She received a flu vaccination in her left deltoid on that date. *Id*. at 32-33. She wrote in her journal that she did not go to church that night because she had gone to the doctor for not feeling well and for a bug bite on her neck and had to pick up medicine. Pet. Ex. 17 at 31-32. She also wrote that she received a flu shot at the visit, nothing more. *Id*. at 33.

Petitioner's journal entries from September through the end of 2014 included: practicing flute and piano, cleaning the porch and appliances, scrubbing rust, cleaning behind the refrigerator, vacuuming, sweeping, doing laundry, cleaning the bathroom, cooking, mowing the lawn, biking, taking care of her grandson and throwing the ball with him, babysitting, exercising. She also wrote about symptoms after stopping a hormone patch, reflux, medication side effects, dizziness, fatigue, ear throbbing, cramps in left leg, right ear pain, headaches, right side and top of head pain, memory problems, itching of her right rear scalp, severe chest pain, cough, hair loss, gastro issues, GERD, weakness, catching the flu from her children, and neck pain. Pet. Ex. 17 at 28-31, 35-36, 49, 68, 73, 85-86, 91-92, 94, 102, 110, 113-14, 126, 133, 140, 142-43, 152, 154-56, 161-62, 166, 169-71, 175-76, 179-80, 182, 183,185; Pet. Ex. 16 at 1343-56, 1359-60, 1362, 1366-72, 1380. Of note, on December 23, 2014, she wrote about severe hip pain that rendered her unable to walk and giving her a limp for a week or two. Pet. Ex. 16 at 1378-80, 1384.

Petitioner presented to the PCP on January 22, 2015 for left knee pain. Pet. Ex. 27 at 43-49. She also reported fatigue, sinus congestion, dizziness, neck pain, and headaches, among other things. *Id*. There was no mention of left arm pain.

The next time petitioner mentioned left arm pain was in June of 2015.[11] She wrote on June 29, 2015 that her "left arm hurts". On July 1, 2015, she wrote that her left arm was "very weak + extremely painful." Pet. Ex. 17 at 373-74. The same day, she wrote "shoulders seizing up. Left arm pain + weakness." *Id*. at 375.

Petitioner returned to Dr. Minor on July 7, 2015. Testing of her shoulders was consistent with her prior test results indicative of "adhesions of her right and left C7 dural sleeves, spinal nerve roots, or adjacent structures of the joint capsule of her left and right shoulders." Pet. Ex. 22 at 102. She complained of sharp pain in her left bicep and stiffness of both her left and right shoulders. *Id*. at 104.

At her July 8, 2015 visit with Dr. Minor, she reported sharp left bicep pain and left and right shoulder stiffness, rating her left bicep as a 9 out of 10, left shoulder as a 10 out of 10, and right shoulder as an 8 out 10. The date of onset was listed as July 7, 2015. Pet. Ex. 22 at 105-06.

On July 9, 2015, petitioner wrote, "My arm was super sore + it was throbbing plus I felt lightheaded + weak. The arm has made me kind of groggy + lethargic too. It just zaps my strength." Pet. Ex. 17 at 380-82.

The same day, petitioner presented to the PCP reporting left shoulder and arm pain rated 9 out of 10 that was sharp and burning for three to four weeks. The record includes, "Degenerative C-spine left rotator cuff pain unimproved on Motrin OTC Naprosyn, cold pack, hot pack range of motion incompletely helpful requesting injection trial…". Pet. Ex. 27 at 230. She also reported back, neck, and joint pain and joint swelling. *Id*. at 233. The assessment was left rotator cuff syndrome which had deteriorated. *Id*. A Kenalog injection for rotator cuff syndrome[12] was administered in her left deltoid. *Id*. at 234.

Petitioner returned to Dr. Minor on July 10, 2015, reporting that she had been feeling better and received a cortisone injection. She rated her left bicep pain as an 8 out of 10, left and right shoulder pain as an 8 out of 10, and both shoulders being stiff. Pet. Ex. 22 at 107.

---

[11] Journal entries from January through July of 2015 included complaints of hair thinning, chest pain, not feeling well, reflux, right ear pain, sore right eyebrow, ring finger pain, back pain, left knee soreness and hurting, and being nearly immobile. She also exercised, babysat, played with her grandson at the park, mowed the lawn, rode her bike, "moved the table back to the dining room", moved her bedroom furniture around, "cleaned every inch of this house", swept, mopped, cooked, turned a mattress, shampooed carpet, saw her chiropractor, and practiced the flute and piano. Pet. Ex. 16 at 1403-04, 1406, 1409, 1416, 1417-25, 1453, 1456, 1461, 1466-70, 1476, 1513, 1520, 1523; Pet. Ex. 17 at 225, 237-38, 242-45, 248, 251, 269, 270, 275, 304, 312, 316, 345, 353, 358, 374-76, 379-82. At no point in this timeframe did she write about arm or shoulder pain.

[12] There are no prior records of when or upon what basis petitioner was diagnosed with rotator cuff syndrome.

Petitioner presented to Dr. Minor on July 13, 2015, with 4 out of 10 pain of the left bicep and 5 out of 10 pain in both shoulders with stiffness. The objective findings on examination were cervical in nature. Pet. Ex. 22 at 108.

On July 14, 2015, petitioner returned to the PCP for a well woman exam with complaints of fatigue, nocturia, pelvic pain, and back and neck pain, among other complaints. Pet. Ex. 27 at 64-66. The history of present illness included left shoulder pain better postinjection and arthritis without focal weakness. *Id*. at 64. On examination, she had no joint swelling or limb deformity. *Id*. at 67. She was noted to have rotator cuff syndrome that was improved and osteoarthritis of the c-spine and lumbar spine. *Id*. at 65, 67-68.

At her July 31, 2015 visit to Dr. Minor, petitioner reported being better with pain reduced in the left bicep and shoulders. Both shoulders were still stiff, but Tylenol provided relief. Pet. Ex. 22 at 109. In August of 2015, she reported increased pain in her left bicep and left shoulder with no pain in the right shoulder. *Id*. at 112. The objective findings remained that her pain was cervical in nature. *Id*. She continued to have headaches, neck and back pain, and hip pain. Her left shoulder, left arm, and left bicep pain fluctuated depending on activities through October 7, 2015.[13] *Id*. at 113-33.

On October 8, 2015, petitioner called her PCP with complaints of dizziness, light-headedness, pain in her left arm, and chest pain. Pet. Ex. 2 at 159. She requested an appointment. *Id*.

Petitioner saw Dr. Minor on October 9, 2015 and reported 0 out of 10 pain in her left arm and in her back; she also reported 6 out of 10 neck pain and neck stiffness. Pet. Ex. 22 at 132.

A journal entry on October 10, 2015 included bad reflux, headache, and sick to her stomach. Pet. Ex. 17 at 491-93.

Petitioner presented to the PCP on October 14, 2015, with chest and left arm pain for four months. Pet. Ex. 27 at 177. She had painful abduction and external rotation of the left shoulder with intermittent pectoral pain with motion. *Id*. She complained of chest wall pain, constipation, nausea, heartburn, parasternal position change pain, menopause, depression, and seasonal allergies. *Id*. at 180. The assessment included unchanged osteoarthritis and improved rotator cuff syndrome. *Id*. She was administered a pneumococcal conjugate vaccination in her right deltoid and a flu vaccination and a betamethasone injection in her left deltoid. *Id*. at 181-82.

Petitioner presented to Dr. Minor on October 19, 2015, reporting 0 out of 10 pain in her arm and back but 2 out of 10 pain in her neck. Pet. Ex. 22 at 134.

---

[13] Petitioner's journal entries from July to November of 2015 described activities like laundry, babysitting, cooking, cleaning, practicing the flute and piano, going to the chiropractor, biking, and running. She also wrote about symptoms including reflux, right hip pain, lethargy, dizziness, and forgetfulness. Pet. Ex. 17 at 389, 395-96, 406, 410, 413, 418, 428-31, 454, 483-84, 492, 503, 505, 516-18, 523, 534, 537. She did not document any issues related to her arm or shoulder.

She presented to Dr. Minor on November 9, 2015 and reported left arm pain as a 0 out of 10 but her upper back and neck as a 7 out of 10. Pet. Ex. 22 at 135. Her complaints thereafter through the end of 2015 were related to her hip, upper back, and neck with no further left arm or shoulder complaints. *Id*. at 136-41.

Petitioner presented to various providers for unrelated care through the end of 2015 and throughout 2016.[14] *See* Pet. Ex. 2 at 17-23, 158 (two in-person visits and one phone call for a rash); Pet. Ex. 13 at 115, 261-64; Pet. Ex. 27 at 134, 161, 184 (visit following hospitalization for global amnesia); Pet. Ex. 22 at 142-54 (chiropractor for upper back, neck, and hip pain).

The next time any arm or shoulder pain was documented was during petitioner's PCP visit on August 8, 2016. She complained of fatigue, decreased vision, nasal congestion, constipation, incontinence, nocturia, back pain, headaches, anxiety and depression, heat intolerance, and seasonal allergies. Pet. Ex. 27 at 126-29. Upon examination she demonstrated painful abduction with external rotation of the left shoulder with "crepitance." *Id*. at 129. She was noted to have "improved" left rotator cuff syndrome and unchanged osteoarthritis. *Id*. at 130, 132.

On December 19, 2016, petitioner presented to a new primary care provider, Lee's Summit Physician Internal Medicine ("Lee's"), with complaints of acute sinusitis ongoing for two months with right ear pain, headache, and nasal congestion. Pet. Ex. 5 at 4. She also reported a rash that had been recurring for several years but had not been diagnosed. *Id*. Upon examination, her ear was moderately swollen, and she had a rash on her abdomen. *Id*. at 5. A flu vaccination was administered but the record does not state in which arm it was given. *Id*. at 5-7. Petitioner did not report a history of left arm pain.

There is a five-month gap in the medical records until petitioner presented to Dr. Maugans, an orthopedist on May 3, 2017, with a three-year history[15] of left shoulder pain associated with a flu vaccine.[16] Pet. Ex. 6 at 1. The pain was "bothering her off and on, but may be worse over the past six months." The pain was mainly in the lateral aspect of her shoulder with some radiation down the upper arm. She had done exercises on her own and did not take a lot of anti-inflammatory medications. She had full range of motion in her left shoulder and 5/5 strength throughout the left shoulder on muscle testing. She had positive Hawkins impingement, positive Speed's test, and positive cross-body adduction test on the left shoulder. There was a little tenderness over the acromioclavicular joint and slightly less tenderness of the anterior bicep tendon. Dr. Maugans'

---

[14] Relevant journal entries from 2016 included: weakness, fatigue, gum recession, headache, ear pain, right leg and hip pain, arthritis in hand and knee, bruise on her left middle finger, left hand pain, eczema, amnesia and memory issues, and stomach pain. Her activities included practicing flute and piano, exercise, cleaning, and "very taxing" yardwork and landscaping which included gardening and lifting heavy rocks. Pet. Ex. 17 at 607, 620-22, 624, 677-79, 692, 724-25, 736, 752, 757, 762, 764, 778, 782, 795, 812-13, 831-32, 838, 860-61, 871-73, 884-86, 899-900, 935, 937, 943-44, 971, 1038-40, 1051, 1057, 1068-69.

[15] The November 21, 2013 flu vaccine was four years prior. This visit was also after she hired counsel and was advised that she needed to see a doctor for her "shoulder". Tr. 117.

[16] Petitioner's journal entries between January and April 2017 included: rash, breathing issues, chest pain, ear pain, stomach pain, medication side effects, flu, bronchitis, and sore gums. Her activities included housework, running, and walking. Pet. Ex. 17 at 1082-87, 1099, 1107, 1123, 1124, 1126-27, 1131, 1134-37, 1139, 1144, 1145, 1155, 1165-66.

assessment was left shoulder pain, likely rotator cuff tendinitis and possible bicep tendinitis. An MRI and physical therapy were ordered. *Id*. No other records from Dr. Maugans were filed.

Petitioner presented for physical therapy ("PT") on May 12, 2017 reporting an infection and pain "@ location" following a flu shot three years ago in September 2014.[17] Pet. Ex. 7 at 4, 43. She had tried steroid injections and Tylenol. *Id*. She reported pain of 9 out of 10. *Id*. at 43. Her presentation was noted as consistent with left shoulder impingement. *Id*. at 45.

An MRI of petitioner's left shoulder performed on May 16, 2017, revealed mild supraspinatus and infraspinatus tendinopathy without a tendon tear, mild acromial navicular joint degenerative changes, small subdeltoid/subacromial bursal effusion which may represent bursitis, and small subcortical cysts in the superolateral humeral head which may be related to chronic repetitive trauma. Pet. Ex. 6 at 4-5.

Petitioner returned to physical therapy on May 17, 2017 and May 18, 2017. Pet. Ex. 7 at 37, 40. The record noted her treatment with a chiropractor for arthritis in her neck. She had 0 out of 10 pain of her left arm that could increase to 8 out of 10 depending on position. *Id*. at 37, 41. The physical therapist wrote, "[patient] is adamant about her situation being caused by the flu vaccine and she wants to make sure that I have documented this accordingly. States there is a 'Federal Injury Program' for people that were injured by injections." *Id*.

Petitioner presented to her PCP on May 24, 2017, reporting dizziness that began a month before, lightheadedness, spinning and imbalance, fatigue, ear pain on the right, history of left arm injection injury being treated at Rockhill Ortho, and weakness. Pet. Ex. 12 at 16-18. Her affect was "odd", and she was "argumentative." *Id*. at 18.

Petitioner returned to PT on May 24, 2017 reporting 0 out of 10 pain but was a "little sore for a couple of days" after last session. Pet. Ex. 7 at 34. Petitioner requested that she not be asked to provide a pain rating and functional changes at each appointment and "became combative." *Id*. Petitioner continued to attend physical therapy regularly through June of 2017. *See generally* Pet. Ex. 7.

Petitioner presented to the PCP on November 9, 2017 for an annual physical. She had intermittent PVCs on Holter monitor without syncope, non-exertional chest discomfort with position, and palpable chest pain over the costochondral area left greater than right with no radiation, worse with caffeine intake.[18] Pet. Ex. 27 at 245. She had complaints of fatigue, difficulty falling asleep and staying asleep, tinnitus, chest pain and palpitations, frequent indigestion, nausea, heartburn, back pain, joint pain and joint swelling, anxiety, cold and heat intolerance, and seasonal allergies. *Id*. at 248. On examination she had "painful abduction improved external rotation left shoulder with decreased crepitance" and no weakness, lesions, or rashes. *Id*. at 248-49. The record

---

[17] The infection occurred following the November 21, 2013 flu vaccine, four years before. *See* Pet. Ex. 2 at 179. There was no reported infection following the September 10, 2014 flu vaccine or the October 14, 2015 flu vaccine.

[18] There were no cardiology records filed.

reflected improved left rotator cuff syndrome. *Id*. at 249. A flu vaccine was administered in her left deltoid.[19] *Id*. at 251-53.

At the end of 2017, petitioner included her current counsel's name, a phone number, and "imaging for vaccine injury" in her journaling. Pet. Ex. 17 at 1344, 1345. She had unrelated medical testing and imaging in February and March 2018, including a normal chest x-ray. Pet. Ex. 11 at 52; Pet. Ex. 12 at 30. On March 1, 2018, she wrote that her left arm was sore after helping her son and daughter-in-law move into a new home. Pet. Ex. 17 at 1553.

On March 2, 2018, petitioner presented to her PCP with complaints of dizziness that started two months prior with associated blurred vision, chest pain/pressure, headache, nausea, and palpitations. She had no syncope or falling and no clear triggers other than change in position. Pet. Ex. 12 at 12. She reported being "involved in a vaccine injury lawsuit, requesting an ortho group contact information." She stated she had seen Rockhill Ortho before. *Id*. Her current problems included "[a]rm pain, left after injection injury, 2014". *Id*. at 13. Her affect was "odd". *Id*. at 14.

She wrote in her journal on April 6, 2018 that she noticed her left arm had been "very sore lately" affecting her piano playing. She further wrote that she will "make note of this" and needed to "get to an orthopedic doctor fast". Pet. Ex. 17 at 1651.

Petitioner presented to her PCP on June 6, 2018 for medication check and various symptoms including left foot pain from plantar warts. Her examination was normal. Pet. Ex. 12 at 4, 6.

On June 13, 2018, petitioner presented to a pain management specialist but refused to fill out the intake form. Pet. Ex. 11 at 3. Petitioner reported left arm pain with pain score of 8 out of 10. She brought multiple records from her lawsuit and reported receiving a flu vaccine in 2013 in her upper left arm with problems ever since and suing the federal government. *Id*. at 5. She described her pain as burning and aching and said that physical therapy and injections made her pain worse. *Id*. Physical examination showed "excellent range of motion of her cervical spine left shoulder. There is no muscle atrophy. There are no masses[,] palpable lesions[,] or evidence of tissue trauma regarding her flu vaccine. Keeping in mind this was several years ago." *Id*. at 6. Physical therapy and non-steroidal therapy were all that could be offered. *Id*. at 7. This record as filed contained a host of random records from petitioner's PCP and Dr. Minor including undated handwritten chiropractic records with notations including "2013 injury", "flu <u>vaccine</u>", "injections", "<u>P.T.</u>" "Ch L upper arm" "[illegible] excruciating", "NSAID", and "RTC" with corresponding dates. *Id*. at 53.

Petitioner's journal entries for June 2018, included her visit to pain management and trying to explain to the doctor why she was there, the type of shot she had, and the pain in her arm. "[H]e did say he would provide paperwork for the lawyer." He told her she would probably always have pain, and nothing would help. He asked if Ibuprofen worked, she told him she doesn't take it

---

[19] Journal entries from July through December 2017 described a recent move, long bike rides, moving furniture around, cleaning, gardening, fever, bug bites, forgetfulness, bad knee pain, and chest pain. Pet. Ex. 17 at 1218, 1222, 1223, 1234, 1242, 1251, 1260, 1268, 1273, 1276-77, 1306-07, 1312, 1343, 1344, 1346, 1349, 1364, 1406, 1420, 1484, 1486, 1492, 1495, 1496, 1499-1500.

because it messes with the liver. Pet. Ex. 17 at 1784. In June 2018, she also ran, walked, biked, got very lightheaded and dizzy, was too sick to go anywhere, and had stomach pain. Pet. Ex. 17 at 1788, 1789, 1791. Page 1790 is redacted.

Petitioner had unrelated care in June and July 2018. Pet. Ex. 12 at 1-3, 36-38. She presented to Dr. Minor regularly throughout 2018 for neck and back pain without any complaints of left arm or shoulder complaints until December 12, 2018. Pet. Ex. 22 at 155-66. On December 12, 2018, she reported left deltoid "still sore from a vaccine injection in 2015." *Id*. at 166. Thereafter, her visits with Dr. Minor in January of 2019 included complaints of left knee pain, lower and upper back and neck pain. *Id*. at 170-73.

Petitioner presented to her PCP on February 25, 2019 for sinus issues. She also complained of neck pain, radiating into her left shoulder. Pet. Ex. 12 at 8. Her affect/demeanor was "odd". *Id*. at 10. Examination of her left shoulder was normal with no edema or evidence of acute injury. Her muscle strength was normal, neurovascular sensory exam of C1 through T2 was normal to light touch and pain, and deep tendon reflexes were 2 out of 4 biceps. She had pain at the trapezius but full range of motion with extension, flexion, abduction, with pain on abduction and forward elevation greater than 160 degrees and negative Hawkins and Neer tests. The assessment was acute maxillary sinusitis, headache due to sinusitis, and cervical radiculopathy with arthritis in the shoulder. X-rays of the left shoulder and cervical spine were ordered. *Id*.

Petitioner presented to Diagnostic Imaging that same day, February 25, 2019, for x-rays. X-ray of the cervical spine revealed multilevel degenerative disease with mild grade 1 anterolisthesis of C2 on C3. There was carotid artery atherosclerosis noted. Pet. Ex. 12 at 26. X-ray of the left shoulder was normal with no soft tissue abnormality. *Id*. at 28.

Petitioner returned to the PCP on March 26, 2019 for her annual exam. She complained of mild heartburn and stated she had chronic shoulder pain that "started in 2015 after a vaccination" and intermittently sees an orthopedic. Review of symptoms was positive for "chronic leg arm/shoulder pain, wants to see ortho" but negative for arthralgias, joint stiffness, or myalgias, dizziness. Pet. Ex. 14 at 7. Her left arm was not examined because she wanted an orthopedist. *Id*. at 9. Petitioner was sent for an ultrasound duplex of the cervical carotid arteries on April 2, 2019. *Id*. at 21-22.

On May 1, 2019, petitioner presented to her PCP for complaints unrelated to the alleged vaccine injury. Pet. Ex. 14 at 4-6.

Petitioner presented to Dr. Minor on October 9, 2019 reporting left arm pain at an 8 out of 10 with lower back and mid back pain of 6 out of 10. She had intermittent headaches and said her "left arm [pain] is intermittent." The objective examination was cervical in nature. Pet. Ex. 22 at 175.

Journal entries for the remainder of 2019 included her review of her medical records looking for notes on her left arm injury. Pet. Ex. 17 at 2661-70. She wrote, among other things, that Dr. Buie's notes are sometimes inaccurate regarding her hearing issues and the records only note left arm rotator cuff syndrome—not that she was injured or had chronic pain from the time of

the 2013 vaccine. A large portion of one page in her journal is redacted. She also wrote, "[t]his is connected w/ a phone call I made on Dec. 3, 2013 that recorded my complaint about my arm oozing and having puss and also being very difficult to move. Stiff + painful." *Id*. at 2663. Her family remembers the infection and her complaints and that she called the doctor about 5 days— maybe 3 or 4 days—after it showed signs of infection. Petitioner wrote that she left several pages blank here intentionally so she could write about her vaccine injury. *Id*. at 2671. On December 26, 2019, she wrote that her arms ached, and she felt weak. *Id*. at 2744.

Thereafter, the journal entries include entries about her attorney advising that he would pay for them all to fly to DC and stay over, her complaints with various doctor offices and their treatment of her and her receipt of a letter from her primary practice that she should find another practice to go to. Pet. Ex. 17 at 2820-24, 2959-61, 2966, 3043, 3399-3406. She also wrote about sledding with her grandchildren and pulling them "up + back" the hill in the sled. *Id*. at 2824-25.

Petitioner had an annual physical on September 29, 2020. She had complaints of symptoms unrelated to her left shoulder but denied back, neck, and muscle pain. Pet. Ex. 27 at 50-53. On examination, she was noted to have painful abduction but improved external rotation of the left shoulder. *Id*. at 54. The assessment among other things included osteoporosis, improved osteoarthritis, and unchanged left rotator cuff syndrome. *Id*. at 54-56. She received a flu vaccine in her left deltoid at this visit. *Id*. at 57.

Journal entries for January through June of 2021 included complaints of right shoulder and shoulder blade pain for about two weeks that affected daily activities like doing dishes and other housework; "I have costochondritis but it spreads to the back + shoulders + arms eventually"; "Horrible pain!!! Jabbing, stabbing and searing (sic) pain". Pet. Ex. 17 at 3653-54. In February 2021, petitioner wrote about her alleged vaccine injury from a flu shot in 2015, followed by an infection which eventually cleared but "the arm remained hard to use and was very sore" for several years, rendering her unable to do regular activities. She wrote about searching on the internet, finding Bruce Slane's name and contacting him. "To this day my arm hurts in certain positions. It has never been the same since the shot in 2015." *Id*. at 3816-17. She wrote that she still has discomfort, and her left arm is smaller than her right. *Id*. at 3818.

In April 2021, petitioner wrote about a conversation with her husband and his concern that the attorney did not know that her arm did not "hurt so much anymore." Pet. Ex. 17 at 4089. She wrote about how she believed her left arm was weaker and skinnier and still hurt when held in certain positions. *Id*. at 4090. Petitioner apparently detailed conversations with her counsel that were redacted and her husband's concerns related to her alleged vaccine injury. She wrote that her arm is not as painful anymore. She further recounted what happened when she received the vaccine and wrote that she waited to call her doctor because she "was trying to give [her] arm time to recover from the shot." She also wrote that she has not been able to use her arm without pain and discomfort since the vaccination in November 2013. *Id*. at 4091-94, 4100-05.

Petitioner presented to the PCP on July 20, 2021 with three months of right breast pain. Pet. Ex. 27 at 285-93. She reported various complaints including back and neck pain. There was no mention of left shoulder or arm pain. *Id*. at 288-89. On examination, it was noted that "painful abduction [was] improved [, and] external rotation left shoulder BETTER". *Id*. at 289.

### C. Affidavit and Testimony of Petitioner, Neena Hartshorn

#### a. Affidavit

Prior to the flu shot, petitioner affirmed she had "no pain, muscle aches or range of motion limitations in [her] left shoulder or left arm" and had no issues with regular activities like sleeping, reaching, pushing, or pulling. She also affirmed never sustaining any injuries to her left shoulder prior to the vaccination. Pet. Ex. 3 at 1.

Petitioner affirmed receipt of a flu shot on November 21, 2013 and pain that began "immediately following the vaccination" with some pain and soreness at the injection site. She thought the needle was placed very high in her left shoulder. Pet. Ex. 3 at 1. The pain worsened the following day, and she had difficulty moving her arm. Within 48 hours, the injection site "began to ooze." *Id*. at 2.

She called her PCP on December 3, 2013 and reported that she had pain in her left shoulder since receiving the vaccination and that the vaccination site was "scabby and was starting to ooze." Her PCP prescribed 20 days of antibiotics. Pet. Ex. 3 at 2.

Petitioner called her PCP again on December 23, 2013 and reported that she still had pain and soreness in her left shoulder/arm, "which was affecting [her] everyday use of [her] left arm." She was prescribed prednisone and told to follow up if the pain did not resolve. Pet. Ex. 3 at 2.

She affirmed increased pain, soreness, weakness, difficulty with over shoulder activities, and limited range of motion in the weeks following the vaccination. Pet. Ex. 3 at 2. On January 3, 2014, she fell ice skating and injured her left ribs but did not impact her left arm/shoulder. *Id*. She then presented on January 7, 2014 for rib pain associated with the fall and also reported pain and difficulty with her left shoulder since the vaccination. She had an x-ray that showed no evidence of fracture and was prescribed tramadol for pain. *Id*.

She returned to her PCP on February 27, 2014 due to the pain, soreness, and "throbbing on and off" in her left arm since the flu vaccination. She was advised to use hot and cold packs, continue taking Tylenol, and return in a month if symptoms continue. Pet. Ex. 3 at 2.

Petitioner affirmed that she suffered months of worsening and radiating pain, limited range of motion, and difficulties using her arm like left-sided sleeping, reaching, and over the shoulder activities. Pet. Ex. 3 at 2. She did not follow up in the hopes that the pain would self-resolve. *Id*. When it did not, she presented to the PCP on July 9, 2015 with complaints of limited range of motion and sharp, burning pain in her left shoulder. *Id*. at 2-3. She affirmed that "Motrin, Naprosyn, and hot and cold packs" did not relieve the pain. She received a steroid injection and was diagnosed with "left rotator cuff syndrome" with only temporary relief. *Id*. at 3.

According to petitioner, the pain and limitation persisted over the following months. She did not seek care, hoping it would get better. When it did not, she contacted the PCP on October

15

8, 2015 and presented on October 14, 2015 with left shoulder pain that worsened with certain movements. Pet. Ex. 3 at 3. She received a flu vaccine in her left arm, Prevnar 13 in her right arm, and a betamethasone Sodium Phosphate injection in her left shoulder with only temporary relief at that visit. *Id*. Despite continued pain, she did not return to the doctor because she felt as though the condition was "passed off and not well attended to." She also hoped it would self-resolve. Pet. Ex. 3 at 3.

Petitioner affirmed after months of no improvement, she made an appointment with orthopedist Dr. Maugans on May 3, 2017. At that appointment, she mistakenly reported receipt of the flu shot as three years ago rather than four. Pet. Ex. 3 at 3-4. Dr. Maugans ordered an MRI and physical therapy and advised that her shoulder pain was likely rotator cuff and bicep tendinitis. *Id*. at 4. She attended six weeks of PT and was told she had left shoulder impingement syndrome and was provided a home exercise program. Her last PT appointment was June 30, 2017. Pet. Ex. 3 at 4.

Petitioner affirmed undergoing an MRI on May 16, 2017 which showed "mild supraspinatus and infraspinatus tendinopathy, mild acromial navicular joint degenerative changes, small subdeltoid/subacromial bursal effusion, and small subcortical cysts." She noted that she was advised that the subcortical cysts could be from chronic repetitive trauma, which was "far from the truth" because she never sustained any injury to her left shoulder other than from the November 21, 2013 vaccination. Pet. Ex. 3 at 4.

As of the time of her affidavit, petitioner affirmed she had not yet sought further care for her left shoulder due to insurance but was now seeking care for the pain and weakness she suffered in her left shoulder. She continued to do home exercises but still had aching, limitations, pain with certain movements, difficulty sleeping, reaching, lifting, pulling, carrying bags, over shoulder activities, and activities of daily living. Pet. Ex. 3 at 4.

### b. Testimony

Petitioner testified that she went to her PCP's office on November 21, 2013 for the flu vaccination which was administered by a nurse in the upper part of her left arm. Tr. 8-10. She claimed that the shot wasn't "smooth" but she did not say anything to the nurse. Tr. 10, 12-13. She felt a "sharpness" she didn't feel when Dr. Buie gave her a shot. Tr. 13. Petitioner drove herself home. Tr. 13. She did not recall saying anything to anyone at home that day about the shot. Tr. 14, 15. That evening she had the typical soreness you get from a vaccination as well as intermittent sharp pain. Tr. 14-15. She would have swabbed the location with alcohol to keep it clean. Tr. 16-17.

The next morning, her arm felt very sore, uncomfortable, painful, and was burning. She noticed her arm was stiff and hard to move during normal activities like loading the dishwasher and getting dressed. Tr. 18-20, 22. Throughout that day, her range of motion became "smaller than usual" and it was painful to move her arm. Tr. 23. Two days later her arm was "very red" and raised like a boil. Tr. 22. It got hot like a fever and developed puss. Tr. 24. This was noted the "minute [she] got up." Tr. 25. She felt sick from the pain and started reducing her activities. Tr.

25. She told her husband at that point that there was "something seriously wrong" with her arm. Tr. 25.

Petitioner acknowledged that the medical records say she called the doctor on December 3, 2013, but she claimed she called within 3 to 5 days after the vaccine "because [she] was so sick with that arm" there would be no reason she did not call the doctor. Tr. 26. She probably left a message detailing what was happening. Tr. 27. She stated that Dr. Buie is 50 miles from where she lives and is very busy, so based on her description in the message, he prescribed an antibiotic, but she did not speak to him directly. Tr. 27-28. At that point she had no range of motion and could barely use her arm. Tr. 28-29. The antibiotic took care of the infection, but her arm still hurt. Tr. 29. Her arm was red "at the shot site for three weeks before it really disappeared." Tr. 32. When asked to distinguish whether the infection site was at her shoulder or her arm, petitioner agreed the infection site was around four fingers down from her shoulder, or the mid deltoid, and the pain radiated throughout her entire arm. Tr. 29-32, 45.

Petitioner stated she had multiple visits with the doctor in December of 2013 for her arm. Tr. 33. She remembered seeing the PCP on December 23, 2013 and being given prednisone for the pain "where the shot was". Tr. 33-34. After a leading question by counsel, she then stated the pain was in her left shoulder, radiated below the elbow in the arm and sometimes into her fingers. Tr. 34-35. The pain medications and shots took away the pain temporarily, but it always came back. Tr. 35.

Petitioner described her fall while ice-skating in January of 2014 injuring her left ribs, knees, and legs but not her left arm, but her left arm pain was probably benefitted by the medications she was given for her ribs. Tr. 36-37, 39, 40-41. She stated that her left arm was still sore at that point and the pain was constant, but the rib pain was prominent at that time. Tr. 39-40. Her left arm never stopped hurting at the vaccination site and then radiated through the arm "for a long, long time." Tr. 41-42. She described the pain as radiating both up towards her left shoulder and down towards her elbow. Tr. 42.

Petitioner then stated she went to the doctor for her arm a couple of months later and he gave her a cortisone shot for the pain, told her use heat and ice, and keep exercising. There was no explanation provided for the pain she experienced. Tr. 43-44. She kept trying to explain to people that the pain started with the shot and was not improving. Tr. 44. She testified that the pain was persistent despite the gaps in medical treatment. Tr. 45.

Petitioner testified that from March through June 2014, her left shoulder condition was "bad", her range of motion was restricted, and she couldn't lift anything with her left arm or could only lift it so far due to pain. Tr. 46-47. She still has pain and believes that this injury will "be there the rest of [her] life . . . in that shoulder." Tr. 52-53.

Petitioner received another flu vaccine in her left arm in September of 2014. Her arm was still "sore" and hurt but there was no difference after the September 2014 flu vaccine. Tr. 47-48.

Petitioner discussed her auto accident in 2010, stating it did not injure her left arm, she had whiplash and pain around her neck and trapezius. Tr. 48-49, 50. She was treated by Dr. Minor for

her neck and was "completely rehabilitated". Tr. 49. She maintained that there "is no connection between the car accident and [her] left arm." Tr. 51.

Petitioner stated that she has gone to many doctors who don't "recognize", "acknowledge", or "respect" vaccine injuries. Tr. 53. They called it rotator cuff or bursitis and the nurse at Dr. Maugans' office called it bursitis even before the MRI. Tr. 53. She stated that Dr. Maugans insulted her, said the testing showed no problems, and "scoffed" when she said the pain was from the vaccination. Tr. 54. She mentioned her arm pain to Dr. Minor, whom she saw regularly, and he referred her to a pain specialist, Dr. Chaplick. Tr. 55. Dr. Chaplick said she got a "bad vaccine", and the injury will be with her for the rest of her life. Tr. 54-55.

Petitioner testified that she saw a commercial on TV about vaccine injuries, realized that was the reason for her pain, contacted her lawyer in April 2017, and filled out the paperwork in May. Tr. 55-56.

Petitioner stated that she had pain at the vaccination site, but it affects the whole area and goes beyond that spot. Tr. 56.

On cross examination, petitioner stated she reviewed her affidavit, some medical records and spoke with counsel to prepare for hearing. Tr. 59.

Petitioner described her journals as writings about all aspects of her life, her health, any symptoms she may be experiencing like pain or a cold, doctor visits, what is going on in her life and in the world. Tr. 68-70.

Petitioner stated that she received the flu vaccination every year but not always in her left arm. She never had pain after any vaccines other than the subject vaccine. Tr. 70. In 2013, her health was generally good. Tr. 70-71. She had arthritis in her neck from various car accidents all before the 2010 accident. Tr. 71-72. She discussed the details of the 2010 car accident and stated she did not sustain any injuries in that accident other than whiplash, which was treated by Dr. Minor. Tr. 72-76. Her whiplash was severe and interfered with some activities like cleaning and playing with her grandchildren. Tr. 76-77. She went to treatment for about six weeks. Tr. 77. She added that once you have whiplash, you have it for the rest of your life, and now has permanent arthritic neck pain as a result. Tr. 79. Petitioner stated she then had a rear end collision in 2012 but did not sustain any injury. Tr. 77-78. She was not being treated in 2012 for the 2010 accident specifically, but she continued seeking medical treatment for the arthritis in her neck. Tr. 79-80. When asked about her medical records documenting ongoing neck and back pain, she said she goes to the chiropractor to stay aligned because it is the healthy thing to do for her spine, her neck, and her lower back from pain due to housework and other activities of daily life. Tr. 80-81.

Petitioner stated that the pain she had from the November 21, 2013 flu vaccine was the way the needle felt, it was harder, a sharper experience, "not like excruciating pain" but uncomfortable. Tr. 81, 82. The pain that day was a 7 out of 10. Tr. 82. She probably took Tylenol but normally lives with pain and would not take anything that affects her liver. Tr. 82-83. She generally uses a heating pad to relieve pain. Tr. 83. She then stated the pain developed slowly and gradually until she eventually noticed the puss and her limited range of motion. Tr. 83-84. The day

after the vaccination, the shoulder pain got worse, burning, stabbing, positional, limiting and distracting. Tr. 84. However, as far as she could remember, she was able to wash and dry her hair the morning after the vaccine. Tr. 84-85. The pain at that point was noticeable but not yet disabling, but she is independent regardless of what kind of pain she was in. Tr. 85.

Petitioner disagreed with the record of her phone call to the doctor's office reporting the infection at the injection site, stating she also told them about the lack of mobility and pain in her arm. She then stated that medical records don't report a lot of things and doctors are sometimes incorrect and put information that was never discussed in their record or forget things. Tr. 86-87. She stated the injection site was the spot that was bothering her at that time. Tr. 87.

Petitioner struggled to remember details about the month following the vaccination given that the hearing was years later but recalled her family helping her with certain activities like carrying groceries and lifting heavier items. Tr. 91-93.

The medical record from January 7, 2014 was discussed with petitioner and she stated that she did not see her regular doctor that day. Tr. 87-88. It was pointed out to her that the record noted a bruised knee and a shoulder problem. Tr. 88, 104-08. Initially, petitioner stated she "probably would have told . . . anything that was going on with pain." Tr. 88. She then stated that record did not associate her arm injury with the flu vaccine because the doctor she saw did not know her and she was there for her ribs after her ice-skating fall only. She did not want to mix one issue with another. Tr. 88-89, 104-07. She was adamant that her arm pain was not related to her rib pain and that she did not injure her arm in the fall. Tr. 105-08. No one discussed a diagnosis with her that day. Tr. 108.

Petitioner stated she tripped and landed "[l]ike a log" on her ribs. Tr. 93-94. She did not recall what her arms did when she fell, only that she fell on her ribs Tr. 94. She did not brace her fall with her arms or injure her neck or face, only her knee and ribs. Tr. 94-96, 98. She stated that she couldn't get out bed after that for thirty days and could barely move. Tr. 95-96. The pain was severe, disruptive, and interfered with her activities and sleep, and her husband had to help her get out of bed. She saw the doctor within a few days. Tr. 100-01. She recently had a different rib issue diagnosed as costochondritis, which was also very painful and limiting and took 30 days to recover. Tr. 101-02. She was given pain medications both times and was told to keep moving so she probably got up, washed and dried her hair, and was able to get through it. Tr. 102. She likely documented this in her journal. Tr. 102-03. Petitioner stated that she was probably apprehensive about skating after not skating in years but was not necessarily concerned about her shoulder at the time. Tr. 99-100.

Petitioner agreed she reported arm soreness a few weeks after the skating fall but did not relate it to the vaccination at any of those visits because the pain was the same before and after the fall and the doctor she saw on January 7 was not her regular doctor. Tr. 103-06.

She agreed she received her next flu vaccination along with other shots in September 2014 in her left arm, but deferred to the doctor on that. Tr. 108-10. Petitioner stated that in September of 2014, she still had left shoulder pain. She presented that day for treatment for the shoulder

pain.[20] Tr. 110. She said the pain injections worked but only temporarily for roughly three weeks. Tr. 111-12.

Petitioner was asked about the flu vaccine she received in October of 2015 in her left arm. Tr. 111-12. She stated that if she went back to the doctor in October, her pain must have returned. Tr. 113. She then stated she received another vaccine in that arm in part because she was ignorant to the reason for her arm pain and because she trusted that the doctor knew what he was doing. She now gets shots in other places like her hip. Tr. 114-15.

Petitioner explained that she did not associate her arm pain to the vaccine until 2017 when she saw an ad on TV. Tr. 115-16, 119. She did not report her shoulder pain to anyone other than her attorney as being vaccine related. Tr. 119-20. She did internet searches and found her attorney who advised that she needed to get some assistance from specialists. Tr. 117.

Petitioner agreed that she goes to or contacts the doctor when she experiences symptoms and she kept Dr. Buie up to date with her shoulder issue, which is why she received the pain injections. Tr. 120. She also explained that it was difficult to get an appointment with him and his office is fifty minutes away. Tr. 120. Further, she felt they were not concerned and tried to avoid calling the doctor too frequently because the nurses get upset and treat patients "with disdain". Tr. 121-22. She stated during this time period she had persistent shoulder pain and called the doctor eventually. Tr. 121-22. She added that she would not have called an attorney if she didn't have persistent pain. Tr. 122.

Counsel pointed out that between February 27, 2014 and the next time petitioner complained about her left arm, she had at least four doctor visits and did not mention any shoulder pain. Tr. 123-24. Petitioner responded that she did complain about her shoulder and cannot help it if a doctor doesn't write down what she tells them. She added she had communication problems with doctors in the past with them saying she has things she doesn't. Tr. 124-25. Counsel pointed out that the records document neck pain, burning, and other complaints but no report of left shoulder pain. Tr. 125-26. Petitioner again stated that providers miss things if you have too many complaints, so she only mentioned the problem she was having that day and the reason she was presenting to the doctor. Tr. 126. She added that she has known Dr. Buie for years, and he knows all her issues including the continued pain with her left arm. Tr. 126-27.

Petitioner stated that she wrote about her shoulder pain in her journal and still writes about it. Tr. 127. Her rib pain was more severe than her shoulder pain, but it is the kind of thing that goes away after a certain amount of time. Tr. 127-28. Respondent's counsel noted that petitioner discussed her rib pain frequently and in detail in her journal but only mentioned her shoulder pain once before the November 2013 vaccination and once after it. Tr. 128. Petitioner stated the rib pain was so severe that it's sometimes hard to breathe. Tr. 128-29.

Petitioner was asked when her shoulder pain was at its worst. She responded that when she had the infection, it was difficult to move her arm and it hurt badly. She prescribed antibiotics but her arm was not getting better before the skating fall. Her pain continues today and if she didn't

---

[20] It was noted that she only received the flu shot that day, and petitioner then responded that she was not sure why the shot was administered "in the wrong shoulder" that day. Tr. 110.

still have pain in 2017, she wouldn't have called a lawyer. Tr. 129-31. She stated that she was in so much pain in 2017, she went to the physical therapist. She then said "it was worse in 2017. At that time it was really bad because it made [her] sick enough that [she] couldn't finish the exercise [she] was doing." Tr. 130. She stated at some point she took prednisone and Tramadol for the shoulder pain but deals with the pain now unmedicated because she's concerned about her liver. Tr. 131-32. Petitioner stated that she kept going to the doctor complaining about her pain and "they kept telling [her] it was rotator cuff syndrome" until she realized what was wrong and saw a specialist in 2017. Tr. 132.

Counsel noted the gaps in petitioner's medical record and that she did not see the orthopedic until May of 2017. Petitioner stated she had stopped seeing Dr. Buie, started going to another doctor but had nothing but problems with them, so she didn't want to go back but the pain was more bearable by then. Tr. 132-33. She claimed that gap in the records between December 2015 and August 8, 2016 was because once she would go many times for a complaint, she would stop complaining about it. But she had shoulder problems all that time that caused problems in her daily life and her husband had to assist her. Tr. 133-34.

Petitioner stated that she did not get worse after the October 2015 flu vaccination, or any other vaccine other than November 21, 2013. Tr. 117-19.

Petitioner did not recall Thanksgiving in November of 2013 or Christmas, stating that her arm pain overrode any remembrance of the holidays. Tr. 90-91. She knows she could not lift or carry things, was sure her family helped and only held her grandchildren on her lap. Tr. 92-93.

Petitioner's attorney read an entry from her journal on December 31, 2013 on redirect, in which she wrote she had a bad reaction to a flu vaccine and described her arm shaking and the site was oozing and asked if that reminded her of how her arm was at that time. Tr. 136-38; Pet. Ex. 16 at 1100-01. She then stated she associated the arm throbbing and shaking to the flu vaccine at that time and through 2017 even before she saw the commercial about vaccine injuries. Tr. 138-39, 143. Had she injured her arm in the skating fall she would have written about it in her journal. Tr. 139. If it is not in her journal, it is fair to say she didn't injure her arm in the skating fall. Tr. 140.

Respondent's counsel asked about a journal entry in which she wrote about right ear pain into her neck and left shoulder "aching again near shot site" from a flu shot four months before. Tr. 141; Pet. Ex. 16 at 1136. Petitioner explained that she has ongoing right ear pain that sometimes causes problems in her neck and into her shoulders, but the vaccine injury and the ear issue are not connected. Tr. 142-43.

Respondent's counsel again asked petitioner when she connected her arm pain to the flu vaccine due to the conflict in her testimony, why she did not raise with any medical provider until February of 2014 and why she continued to receive flu vaccinations in that arm.[21] Tr. 145, 148-50. Petitioner responded that when Dr. Buie gave her vaccines, they were never painful, but she

---

[21] Mr. Slane objected to Ms. Kosh's questions on recross, claiming confusion and mischaracterization of the testimony. Tr. 145-48. I assured the parties that I as the trier of fact was not confused and will decide based on the evidentiary record as a whole. Tr. 148.

lacked understanding of why medical professionals do the things they do, she could have sued over a lot of things that have been done to her and for all she knows her records are wrong and she received the other vaccines in her right arm. Tr. 149-51.

### D. Affidavit and Testimony of Petitioner's Husband, Daniel Hartshorn

#### a. Affidavit

Daniel Hartshorn is petitioner's husband. Mr. Hartshorn's affidavit largely repeats petitioner's affidavit, so much so that he affirmed, "my wife's condition in my (sic) left shoulder/arm significantly worsened and was associated with aching, limited range of motion, radiating pain with certain movements, and difficulty in activities involving the use of my (sic) left shoulder/arm". Pet. Ex. 4 at 2; Pet. Ex. 3 at 3.

Mr. Hartshorn affirmed that petitioner's symptoms began "immediately following the administration of the vaccine." He wrote that over the next few days, she complained to him about the shot being too high on her arm and that it was painful, sore, and oozing. He noticed that she was having difficulty moving her left shoulder and arm. Pet. Ex. 4 at 1. Over the next several weeks, Mr. Hartshorn affirmed that petitioner's symptoms were worsening, and she had difficulty with several activities, such as sleeping, lifting, and moving her arm. *Id.*

According to Mr. Hartshorn, at the time he signed his affidavit, petitioner continued to do home exercises as instructed but still complained of "aching, limitations, pain with certain movements in her left shoulder, and I notice that she still has difficulty with sleeping, reaching, lifting, pushing, pulling, carrying bags, over shoulder activities, and activities of daily living." Pet. Ex. 4 at 3.

#### b. Testimony

Mr. Hartshorn testified that petitioner received the flu vaccine in her left shoulder from "our family doctor" and came home that day and said the shot hurt. Tr. 154, 156. The next day, she said it still hurt and for several days thereafter she said it hurt where she got the shot. Even in the "ensuing months and years", she periodically complained of pain where she got the vaccine. Tr. 154, 156. When asked if she complained in December 2013, he stated, "she said where they had given her the shot . . . that's where it hurt." Tr. 158. He did not recall her having any prior left shoulder injury and did not believe she complained about her left shoulder prior to November 21, 2013. Tr. 155-56.

He recalled her going to the family doctor at "several points" to complain that it hurt where the nurse "had shot her" and at "some point she had an infection in that arm as well where the shot was located" and was given antibiotics. Tr. 157. It interrupted her life and her sleep a lot over the past couple of years. She often took Tylenol for the pain to help her sleep. Tr. 157.

Mr. Hartshorn recalled petitioner being in an auto accident in 2010 that was not her fault, but he did not recall whether she was injured. Tr. 155-56.

Mr. Hartshorn recalled petitioner falling in January of 2014 while skating and injuring her chest and right side. Tr. 158-59. He testified that she didn't fracture anything but was in "pain for quite a while"; eventually, the ribs healed, and her chest pain went away. Tr. 159. She didn't complain about her shoulder after the fall, only the ribs. Tr. 159-60.

Mr. Hartshorn stated that in February, March, and April of 2014, petitioner continued to complain that her arm hurt at the location of the shot when she tried to pick up or push something or put her hands over her head, "it would hurt at the location where the shot had been given." Tr. 160, 162. He stated that she was unable to do "some of the things" she had done before without pain, and it hurt sometimes worse than others. Tr. 160-61. He then clarified that she did all her regular activities, "[i]t would just hurt." Tr. 161.

According to Mr. Hartshorn, petitioner mentioned "not long ago" that she stopped having pain. "She had pain up until about – I'm saying maybe six months ago." She didn't mention pain much after that. Tr. 162-63.

On cross examination, Mr. Hartshorn claimed petitioner would discuss her medical issues with him. Prior to vaccination, she was in good health apart from "a little bit of arthritis". Tr. 167. She's had some joint pain after an auto accident treated by a chiropractor that has since resolved but nothing connected to her shoulder. Tr 167-68. He did not recall her suffering from whiplash or injuring her neck in the auto accident. Tr. 168. He also did not recall whether she was unable to do any activities after the car accident. Tr. 168-69. Her chiropractor has also treated her low back pain throughout the years. Tr. 169. He did not remember any other car accidents. Tr. 169.

Mr. Hartshorn did not recall if he accompanied petitioner when she got the flu shot on November 21, 2013. Tr. 169-70. He only recalled that she told him "I have pain in that shoulder where they gave me that shot. I have pain in the location, the site, where they stuck her with the needle." Tr. 170. He thinks it hurt when they gave her the shot, and it continued to hurt, that is what she told him when she got home. Tr. 170-71. According to Mr. Hartshorn, petitioner described it as soreness at the vaccination site. He did not recall it getting worse, only that it hurt and hurt when she moved her arm. She probably didn't do much the rest of that day after the vaccination because she didn't feel well. Tr. 172. He could not say the pain worsened the next day or the day after, only that she said it hurt where the shot was given. Tr. 173-74.

He did not recall whether she had any limitations over Thanksgiving or Christmas that year. Tr. 174. He only recalled that she might have said it hurt when she picked up or pushed things. Tr. 174-75.

He normally carries the groceries, but if she did carry them, it would have been with her right arm. Tr. 175. He thought the soreness woke her up during sleep sometimes, but she had sleeping problems related to "various things". Tr. 175-77. If she had pain that woke her up, she probably just dealt with it and didn't tell him. Tr. 176-77.

Mr. Hartshorn described petitioner's fall while ice skating stating that she was standing by the fence, and it looked like her foot caught on the ice. She went down face first and hard. "I didn't see that she even braced herself with her left arm at all." Tr. 177-78. Someone picked her up then

she came to him and said she wanted to go home. Tr. 178. She had inflamed ribs and hurt her chest and went to the doctor the next day. Tr. 178-79.

According to Mr. Hartshorn, petitioner still had pain at the injection site, when she went skating but was not concerned about skating. Tr. 179. He didn't skate due to age and told her not to go. Tr. 179-80.

Mr. Hartshorn stated that petitioner's ice-skating fall affected her daily activities, and she was unable to pick things up. The doctor gave her pain medication, which she didn't like to take, but she may have taken some to address the pain. Tr. 180.

He recalled her periodically making comments about her left arm hurting where she got the shot. Tr. 180-81. He did not recall her ever saying the pain got worse, but about a year or two ago said that arm was smaller than the other one. Tr. 181. "I think a little bit" smaller. Tr. 186-87.

Mr. Hartshorn related the vaccine to her complaints immediately because she said the shot hurt that day and she continued to complain "that's where they shot me and that's where it hurts. And it's always the same place." Tr. 181-82.

Mr. Hartshorn did not believe any other flu shots petitioner received caused any problems. Tr. 182-83. She only complained about that one site where she got the shot in 2013. Tr. 183. He didn't recall any discussions about her receiving a vaccine in a different site, because she had vaccines before and after without any issues. Tr. 183-84.

Mr. Hartshorn did not remember when petitioner contacted counsel, only that he recalled her talking about seeing a commercial about vaccine injuries and saying she was going to call because her arm hurt where she got the vaccine and there was a vaccine injury program. It was several years after the vaccine. Tr. 184-85.

According to Mr. Hartshorn, petitioner will seek treatment if she has a problem or symptoms. Tr. 185. He then immediately added that she did not see any doctor for a couple of years because she had some trouble in Dr. Buie's office and was looking for someone else but that he does not keep up with his wife's schedule very well. Tr. 185.

Mr. Hartshorn did not recall petitioner suffering from knee and hip pain that was so severe at times she could not get out of bed between 2012 and 2016. Tr. 187-88. He was unsure exactly how bad her arthritis was, but she had chiropractic treatment for her back and had hip and knee pain. Tr. 188.

Mr. Hartshorn stated that in 2013 petitioner was helping to take care of their grandchildren which included an infant. Tr. 189-90. He stated there was nothing related to petitioner's arm that stopped her from taking care of the children, changing diapers, carrying them or chasing them. Tr. 190-91.

On redirect, Mr. Hartshorn stated that he was at work when petitioner took care of the children in 2013, so he did not see what petitioner was doing but he added that when he was there,

she did everything. Tr. 191-92. She would lift and carry them, but she is right-handed and would use her right arm. Tr. 192. Mr. Hartshorn then elaborated that when you pick up a child from the floor you use both hands, and he did not recall her wincing with pain or saying my shoulder hurts and I can't do that. Tr. 192-93. He did recall her saying her arm hurt at times when she was picking up, pushing, or pulling something, but in the last six months he hasn't heard her complain about pain. He also testified that she told him recently—about a month ago—that she had not had left shoulder pain at the vaccination site "for a while now." Tr. 193.

Respondent's counsel asked if petitioner had pain while taking care of the children when he was at work, would she tell him about it. He responded that she would, she's pretty open when she's not feeling well, and he had no specific memory of her saying anything about her arm hurting because of taking care of the children. Tr. 194.

### E. Affidavit and Testimony of Petitioner's Daughter, Anna Marie Hartshorn

#### a. Affidavit

Anna Marie Hartshorn[22] is petitioner's and Mr. Hartshorn's daughter. Pet. Ex. 15 at 1. She affirmed living with her parents in November of 2013 and recalled her coming home after her November 21, 2013 flu vaccine "complaining about the abnormal pain in/at her left shoulder/arm where she received the vaccination." According to Anna Marie, petitioner has had pain and mobility issues in her left shoulder/arm ever since. *Id.*

According to Anna Marie, petitioner complained to her left arm/shoulder pain and weakness on a regular basis since November 21, 2013. Pet. Ex. 15 at 1. Petitioner never had an injury of her left shoulder/arm prior to November 21, 2013, never sustained any falls that could cause a left shoulder injury prior to November 21, 2013, and though in a car accident in 2010, never sustained an injury to her left shoulder/arm as a result of the accident. Petitioner continues to complain to Anna Marie that she has pain in her left shoulder/arm. *Id.*

#### b. Testimony

Anna Marie is petitioner's daughter and lives with her parents. Petitioner had no prior shoulder complaints. She would have told her daughter if she did. Tr. 196-97.

Anna Marie recalled an auto accident in 2010 but did not recall petitioner suffering any serious injuries. Tr. 197-98.

Anna Marie stated that petitioner complained of pain the day she received the vaccine and the day after, which is "pretty normal for a vaccination." It became concerning when the pain and weakness continued for weeks, months, and years. Tr. 198. The vaccine was in November of 2013. Tr. 198. She did not recall specific conversations. Tr. 198-99. Anna Marie never looked at petitioner's arm. Tr. 199. She recalled petitioner complaining about her arm in passing "periodically" for years. Anna Marie testified that her mother is "pretty much the main person in the home who would do the cooking and the cleaning, and she's also a pianist. So as you go about

---

[22] To avoid confusing petitioner with her daughter, her daughter will be referred to herein as Anna Marie.

life using your arms, she would mention it from time to time." Tr. 199-200. Anna Marie did not recall petitioner falling while ice skating. Tr. 200.

According to Anna Marie, over the past year or so, petitioner's arm has been less of an issue for her. Tr. 201.

Petitioner favors her right arm and probably held her grandchildren in her right arm on her right hip. Tr. 201-02. Petitioner would interact normally with her grandchildren for someone her age. Tr. 202-03.

On cross examination, Anna Marie provided her work history and when she lived at home, moved out, and moved back. When asked if she spent a lot of time with petitioner between 2010 and 2013, she responded, "not particularly" and explained that she tended to do her own thing with friends and would spend the night with friends as well. Tr. 203-05. In 2013, she probably saw her parents every weeknight but would spend weekends with friends. Tr. 206.

Anna Marie described petitioner as generally healthy, takes good care of herself, exercises daily, walking, biking and eats well. Tr. 206. She believes she has had depression, IBS, and used an estrogen patch. Tr. 206. She thinks she had some issues with arthritis, "possibly" and has taken some supplements for that. Tr. 207. She has some joint pain now but could not recall if she had joint issues "back then." She also could not recall if petitioner suffered injuries in 2010 in the auto accident but knew the car was totaled. Tr. 207. She recalled an auto incident in 2012 that her mother was "shook up" from but not injured. Tr. 207-08.

Anna Marie recalled petitioner making a doctor's appointment shortly after the vaccination to discuss her ongoing pain. Tr. 208. She referred to her mother's pain after the vaccination as normal pain and did not know if the pain increased, only that it did not go away. Tr. 208-09.

Anna Marie recalled her mother having to take more breaks when doing her daily activities after the vaccination or breaking up the activities and not doing them all at the same time. Tr. 209. If she was home on the weekends, she would see petitioner struggle with things like cooking and cleaning. Tr. 210.

According to Anna Marie, her mother lived in chronic pain and couldn't attend to things the way she used to from November 21, 2013 until about a year or two ago. Tr. 216. She did not believe that had anything to do with any other health issue. Tr. 216. She did not recall petitioner having hip pain, knee pain, headaches, or neck pain between 2013 and 2018 or ever having trouble getting out of bed from pain. Tr. 216. She also did not recall a rib injury from skating. Tr. 216-17. Anna Marie stated her testimony was based on conversations she had with her mother about her arm and she had no knowledge of any other health issues petitioner had. Tr. 217. While she may have heard conversations about health issues while living at home she could not recall her mother sharing information directly with her for issues other than her shoulder. Tr. 218. She never complained to her about any other pain except the arm pain and would bring it up frequently. Tr. 218-19. According to Anna Marie, petitioner is "an older woman" and when you get older "your body starts to work differently." She was always able to manage things, but the shoulder pain "affected her more strongly." Tr. 219.

26

When asked if Thanksgiving and Christmas in 2013 were affected by petitioner's injury, Anna Marie said that Thanksgiving is usually with her dad's family and she did the cooking, so it was not affected and she helped with the decorations, but they are not big shopping people. Tr. 210-11.

Anna Marie had no recollection of a skating incident or her mother complaining about any injury in January/February of 2014. Tr. 211-12. She did not recall petitioner complaining about any other vaccinations. Tr. 212.

**F. Other Evidence**

**a. Journals**

Petitioner initially submitted approximately 1,700 pages of her journal purported to be from 2010-2015. Petitioner filed a status report on May 11, 2020, citing to only three references in the journals "to demonstrate that Petitioner did not sustain any left shoulder/arm injuries prior to the November 21, 2013 flu vaccination." The three references addressed an automobile accident in 2010; an entry on December 31, 2013 wherein petitioner wrote she had left shoulder pain following the flu vaccination, a conversation she had with her PCP, and the medicine she was prescribed; and an entry on January 3, 2014 where petitioner wrote about her fall while ice skating and did not injure her left shoulder/arm. ECF No. 38. She provided no references to onset of her left arm pain or pain in excess of 6 months.

At the end of the fact hearing, I noted to petitioner's counsel that there were multiple gaps in the journal entries. Tr. 224; *see* Pet. Ex. 16. Petitioner was ordered to file the missing journal entries. Tr. 224; *see also* ECF No. 48. Petitioner then filed additional journal entries, which included over 4,000 more pages for a total of approximately 5,700 pages of journal entries. *See* Pet. Ex. 16; Pet. Ex. 17. I have read them all. Petitioner's journals provide almost a daily account of her life and as she describes it "a log of events. of circumstances + occurrences in my life". Pet. Ex. 17 at 864.

**b. Photographs**

Petitioner filed a photograph from "before the November 21, 2013 vaccination" however it is unclear when the photo was taken. Pet. Ex. 18. She also filed two photographs taken on May 4, 2021, purporting to show a scar from the flu vaccine on her left deltoid and her left arm being smaller than her right. Pet. Ex. 19.

**G. Respondent's Position**

Respondent's Rule 4(c) Report ("Resp. Rpt.") filed on December 19, 2018, serves as his position in this matter that it is not appropriate for compensation. ECF No. 19. Respondent disputed that petitioner suffered a SIRVA. Resp. Rpt. at 12-13, 18, citing 42 C.F.R. § 100.3(c)(10). Respondent claimed that petitioner's medical records do not clearly document onset of left arm pain within forty-eight hours of petitioner's receipt of the allegedly causal vaccination; rather her December 3, 2013 record indicates that she had problems "since [she received] a flu shot a week

ago." Resp. Rpt. at 13, citing Pet. Ex. 2 at 179. Further, petitioner did not seek treatment for her left arm/shoulder injury until February 27, 2014, fourteen weeks after her flu vaccination, and she had normal range of motion and appropriate strength at that time on examination. Resp. Rpt. at 14, citing Pet. Ex. 2 at 68-70. Thereafter, there was a sixteen-month gap until the next time she sought care for left arm/shoulder pain on July 9, 2015, at which time she reported arm pain ongoing for three to four weeks, placing onset in June 2015 or 19 months after the vaccination. Resp. Rpt. at 14. Respondent argued that petitioner's treatment for shoulder pain was sporadic and there are large gaps in between visits where petitioner apparently did not seek care. *Id.* Respondent noted that petitioner presented for left arm pain in July and October of 2015 but then did not seek care again until May 2017 when she saw an orthopedist and reported a three-year history of intermittent shoulder pain that she associated with a vaccination three years earlier. *Id.* at 14-15.

Summarily, petitioner did not seek treatment for shoulder pain despite claiming that her pain was "severe" and worsening, she continued to receive injections; specifically additional flu vaccines, in that arm; and she sought medical treatment several times after she received the subject vaccine without mentioning any left arm or shoulder pain. Resp. Rpt. at 15.

## III.    Legal Framework

### A.  Overall Fact-Finding Framework

The process for making determinations in Vaccine Program cases regarding factual issues begins with analyzing the medical records, which are required to be filed with the petition. § 11(c)(2). Medical records created contemporaneously with the events they describe are generally considered to be more trustworthy. *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *but see Kirby v. Sec'y of Health & Human Servs.*, 993 F.3d 1378, 1382-83 (Fed. Cir. 2021) (clarifying that *Cucuras* does not stand for proposition that medical records are presumptively accurate and complete). While not presumed to be complete and accurate, medical records made while seeking treatment are generally afforded more weight than statements made by petitioner after-the-fact. *See Gerami v. Sec'y of Health & Human Servs.*, No. 12-442V, 2013 WL 5998109, at *4 (Fed. Cl. Spec. Mstr. Oct. 11, 2013) (finding that contemporaneously documented medical evidence was more persuasive than the letter prepared for litigation purposes), *mot. for rev. denied*, 127 Fed. Cl. 299 (2014). Indeed, "where later testimony conflicts with earlier contemporaneous documents, courts generally give the contemporaneous documentation more weight." *Campbell ex rel. Campbell v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 779 (2006); *see United States v. U.S. Gypsum Co.*, 333 U.S. 364, 396 (1948).

Despite the weight afforded medical records, special masters are not bound rigidly by those records in determining facts such as the onset of a petitioner's symptoms. *Vallenzuela v. Sec'y of Health & Human Servs.*, No. 90-1002V, 1991 WL 182241, at *3 (Fed. Cl. Spec. Mstr. Aug. 30, 1991); *see also Eng v. Sec'y of Health & Human Servs.*, No. 90-175V, 1994 WL 67704, at *3 (Fed. Cl. Spec. Mstr. Feb 18, 1994) (explaining that § 13(b)(2) "must be construed so as to give effect to § 13(b)(1) which directs the special master or court to consider the medical record...but does not require the special master or court to be bound by them"); *see also Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided

that such determination is rational). There are situations in which compelling oral testimony may be more persuasive than written records. *See Campbell ex rel. Campbell v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 779 (2006). When witness testimony contradicts medical records, such testimony must be consistent, clear, cogent, and compelling to be persuasive. *See Sanchez v. Sec'y of Health & Human Servs.*, No. 11-685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (vacated on other grounds, *Sanchez by & through Sanchez v. Sec'y of Health & Human Servs.*, No. 2019-1753, 2020 WL 1685554 (Fed. Cir. Apr. 7, 2020), review denied, *Sanchez by & through Sanchez v. Sec'y of Health & Hum. Servs.*, 152 Fed. Cl. 782 (2021)) (quoting *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808V, 1998 WL 408611, at *85 (Fed. Cl. Spec. Mstr. June 30, 1998)); *see, e.g., Stevenson ex rel. Stevenson v. Sec'y of Health & Human Servs.*, No. 90-2127V, 1994 WL 808592, at *7 (Fed. Cl. Spec. Mstr. June 27, 1994) (crediting the testimony of a fact witness whose "memory was sound" and "recollections were consistent with the other factual evidence"). Special masters may also consider other types of evidence, such as unsworn statements, on the grounds that the Vaccine Program was designed to have "flexible and informal standards of admissibility of evidence." 42 U.S.C. § 300aa-12(d)(2)(B); *see also Munn v. Sec'y of Health & Human Servs.*, 970 F.2d 863, 873 (Fed. Cir. 1992).

On the whole, a special master's fact findings are to be upheld when the special master's evaluation is evidence-based and not wholly implausible. *See Colon v. Sec'y of Health & Human Servs.*, 156 Fed. Cl. 534 (2021).

## B. Defined Injury

The Vaccine Act defines a "vaccine-related injury" as an "illness, injury, condition or death." §§ 11(c). The Federal Circuit has made clear that "the burden [is] on the petitioner to make a showing of *at least one defined and recognized injury*" to be entitled to compensation. *Lombardi v. Sec'y of Health & Human Servs.*, 656 F.3d 1343, 1353 (Fed. Cir. 2011) (emphasis added). While the Act does not require a petitioner to allege a specific diagnosis, a defined and recognized injury must be more than "merely a symptom or manifestation of an unknown injury." *Id.*

In *Squadroni v. Sec'y of Health & Human Servs.*, the petitioner alleged that a Tdap vaccination caused his "back and shoulder pain and regional pain". The special master determined that the petitioner failed to specify a defined and recognized injury and alleged only "*symptoms* of a non-specific injury". He concluded that "a 'vaccine-related injury' must 'be more than just a symptom or manifestation of an unknown injury,' because such a symptom or manifestation could indicate any number of different underlying injuries, each with its own pathology, making it impossible for the court to accurately determine causation." No. 16-1102V, 2019 WL 6525311, at *18 (Fed. Cl. Spec. Mstr. Nov. 7, 2019), citing *Lombardi,* 656 F.3d at 1352 and *Broekelschen v. Sec'y of Health & Human Servs.*, 618 F.3d 1339, 1349 (Fed. Cir. 2010). Accordingly, the petition was dismissed for failure to establish that the petitioner's pain complaints amounted to a recognized and definable injury as required by the Act. *Id.* at *21.

## C. Severity Requirement

The Vaccine Act requires petitioner to show by preponderant evidence that she "suffered the residual effects or complications of such illness, disability, injury, or condition for more than

6 months after the administration of the vaccine." 42 U.S.C. § 300aa-11(c)(1)(D)(i); *see Song v. Sec'y of Dep't of Health & Human Servs.,* 31 Fed. Cl. 61, 65-66 (1994), aff'd, 41 F.3d 1520 (Fed. Cir. 2014) (noting that a petitioner must demonstrate the six-month severity requirement by a preponderance of the evidence). A petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted). Finding that petitioner has met the severity requirement cannot be based on petitioner's word alone, though a special master need not base their finding on medical records alone. *See* § 13(a)(1); *see Colon v. Sec'y of Health & Human Servs.*, 156 Fed. Cl. 534, 541 (2021).

In *Kirby v. Sec'y Health & Human Servs.*, the special master's finding that Ms. Kirby's injury lasted for more than six months was upheld by the Circuit. 997 F.3d 1378 (Fed. Cir. 2021) (reversing *Kirby v. Sec'y Health & Human Servs.*, 148 Fed. Cl. 530 (2020), after the Claims Court found the special master erred in his severity finding). Ms. Kirby's medical records only documented two months of persisting symptoms after vaccination. Her records were silent thereafter for two years regarding shoulder pain. However, the special master found the following sufficient to overcome the silence in the contemporaneous medical records: 1) petitioner's testimony that she continued home exercises with her home exercise instruction sheets, 2) petitioner's later report to her nurse practitioner about ongoing shoulder pain that began after a vaccination two years ago, and 3) expert testimony of intermittent pain consistent with petitioner's specific shoulder injury. Based on that evidence, the special master found that petitioner satisfied the severity requirement. *Kirby,* 997 F.3d 1378, 1382. In upholding the special master's decision, the Circuit noted that the Claims Court incorrectly found the silence in the medical record as undermining petitioner's testimony. *See id.* Specifically discussing the presumption that medical records are accurate and complete, originating from an interpretation of *Cucuras*, the Circuit clarified:

> *Cucuras* stands for the unremarkable proposition that it was not erroneous to give greater weight to contemporaneous medical records than to later, contradictory testimony. We did not hold that medical records are presumptively accurate and complete. Nor did we state that when a person is ill, he reports all his problems to his doctor, who then faithfully records everything he is told. We reject as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions.

*Id.* at 1382-83. The Circuit held that a reasonable fact finder could find that petitioner's testimony of ongoing pain did not conflict with the records as the records are also silent about the *nonexistence* of such symptoms. *Id.* at 1383. Further, the Circuit acknowledged that the silence in the records could be explained by the fact that petitioner had exhausted all available treatment. *Id.*

In sum, special masters may consider the whole record in evaluating whether there is preponderant evidence for the severity requirement and may find the severity requirement satisfied even if a petitioner's medical records for the alleged injury is not continuous for the six months following the injury. *See Kirby,* 997 F.3d 1378. However, there must be evidence beyond petitioner's word alone, such as other corroborating records or reports, to establish the severity requirement by a preponderance of evidence. *See Colon,* 156 Fed. Cl. 534.

### D.  SIRVA Injury

The Vaccine Injury Table lists a Shoulder Injury Related to Vaccine Administration or "SIRVA" as a compensable injury if it occurs within forty-eight hours of vaccine administration. § 300aa-14(a) as amended by 42 C.F.R. § 100.3. Table Injury cases are guided by statutory "Qualifications and aids in interpretation" ("QAIs"), which provide a more detailed explanation of what should be considered when determining whether a petitioner has suffered an injury listed on the Vaccine Injury Table. 42 C.F.R. § 100.3(c). To be considered a "Table SIRVA," petitioner must show that his injury fits within the following definition:

> SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis . . . . A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i)    No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii)   Pain occurs within the specified time-frame;
>
> (iii)  Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv)   No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

## IV.    Discussion

This ruling is limited to findings related to onset and the six-months severity requirement. The contemporaneous evidence from petitioner's medical records and journals are far more persuasive than later testimony and witness statements. *See Dougherty v. Sec'y of Health & Human Servs.*, 141 Fed. Cl. 223, 229 (2018) ("[T]he special masters have broad discretion to weigh

evidence and make factual determinations."); *Campbell*, 69 Fed. Cl. at 779 ("where later testimony conflicts with earlier contemporaneous documents, courts generally give the contemporaneous documentation more weight.").

The preponderant evidence shows that petitioner received the flu vaccine on November 21, 2013. Pet. Ex. 2 at 74-75. Twelve days later, on December 3, 2013, she contacted her PCP to report an infection at the vaccine site with throbbing and achiness. *Id*. at 179; Pet. Ex. 16 at 1100-01. There were no journal entries between November 21, 2013 and December 30, 2013, documenting any untoward events associated with petitioner's receipt of the flu vaccine, left arm or shoulder pain in the days that followed, or an inability to attend to her daily activities Pet. Ex. 16 at 1080-1100. Petitioner's first journal entry regarding the subject flu vaccination was on December 31, 2013 when she detailed, "my left arm is shaking. I had a bad reaction to a flu shot. The site was oozing at first. Called Doc - gave info. He prescribed antibiotic – Cephalexin. Then, about 3 days after I finished it the arm became sore again. No oozing, but throbbing pain + hard to lift + raise my arm up. So…Doctor Buie prescribed prednisone and said if not better, make an appointment to see him." Pet. Ex. 16 at 1100-01. Petitioner made no mention of immediate shoulder pain upon vaccination, the vaccination being given too high in the shoulder, or any issues associated with her receipt of the flu vaccine immediately following or in the days thereafter until 12 days later when she notified the doctor of the infection at the vaccination site. *See* Pet. Ex. 3 at 1. This absence of any details in her journals about her receipt of the vaccination or any untoward events associated with the administration of the vaccination, or any ongoing issues is notable, given her consistent journaling about various health issues and the depth with which she details health issues when they arise. Her own recitation of the events in her journal begins with her phone call to the PCP regarding an infection at the vaccination site on December 3, 2013. This is indicative of the facts associated with her receipt of the flu vaccine, the events that followed and the onset of left arm issues.

Thereafter, petitioner presented to her PCP on January 7, 2014 for injuries following an ice-skating fall. Pet. Ex. 27 at 267. The medical record from that visit includes "had problems with her arm" but contains no specific reference to the flu vaccine, cellulitis, or left arm pain. *Id*. She called her PCP's office twice more in January 2014 but did not mention any issues with her left arm or the flu vaccine. Pet. Ex. 13 at 174, 176.

In subsequent months, petitioner intermittently wrote in her journal about left arm discomfort. On January 25, 2014, she wrote about taking steroids over the past several weeks for her rib injury and "for flu shot reaction". Pet. Ex. 16 at 1117. On February 26, 2014, she wrote, "Left arm aching again near shot site. This [is] from flu shot 4 months ago." *Id*. at 1136. At a visit with her PCP on February 27, 2014, she reported intermittent throbbing since she received the flu vaccine in November, but examination of her left arm on that date was normal with full range of motion and full strength. Pet. Ex. 13 at 177-78; *see also* Pet. Ex. 16 at 1142-46.

Between March and June of 2014, there was one entry about her arm that included "my left arm hurt[s]. I was breathing hard" on April 7, 2014. Pet. Ex. 16 at 1565. Otherwise, her journals contain a host of other unassociated health issue and involvement in various strenuous physical activities. *Id*. at 1147, 1156, 1166, 1540, 1547, 1566, 1582, 1584, 1588, 1631. She had an annual physical on June 23, 2014 with no mention of left arm complaints. Pet. Ex. 27 at 302-08.

In early July 2014—over seven months post-vaccination—petitioner wrote that her "left arm hurts." Pet. Ex. 16 at 1648. Otherwise, her journal entries in July and August of 2014 were unrelated to her left arm but detailed various other symptoms/ailments and her daily activities. *Id*. at 1639, 1641, 1643-44, 1659, 1684-85, 1690, 1692; Pet. Ex. 17 at 3, 4-6, 8, 10-16, 25.

Taken together, the evidence from the date of the November 21, 2013 flu vaccination supports the onset of petitioner's left arm pain on or about December 3, 2013 or 12 days post-vaccination when she developed cellulitis at the injection site and contacted her PCP. For this reason, petitioner has not met her burden in satisfying the timing requirement for a SIRVA claim under 42 C.F.R. § 100.3(c)(10). Moreover, petitioner's claimed vaccine-related complaints of left arm pain are limited to localized intermittent pain at the injection site. Petitioner's counsel's attempts during the hearing to try and establish a shoulder injury were not supported by the record or the testimony of petitioner and her witnesses. Petitioner, her husband, and her daughter repeatedly referred to petitioner's pain as at the location of the shot, sometimes radiating down through her arm or up to her shoulder. Pet. Ex. 3 at 1; Pet. Ex. 15 at 1; Pet. Ex. 16 at 1100-01, 1136; Tr. 16-17, 32, 33-34, 41-42, 56, 86-87, 141, 154, 156, 157, 160, 162, 170, 172-74, 179-81, 193. Further, when I asked petitioner to place her hand on her arm to show me how many fingers down from her shoulder the vaccination was administered, she placed four fingers down from her shoulder as the site of the injection and infection or her mid deltoid and stated that the pain radiated throughout her arm. Tr. 29-32. Petitioner also testified that she was prescribed prednisone for the pain "where the shot was". Tr. 33-34. Thus, there is no persuasive evidence in the record to support petitioner having suffered a left *shoulder* injury from her flu vaccination. Rather, the evidence shows that she suffered cellulitis at the injection site 12 days post-vaccination and complained of intermittent left arm pain thereafter at the site of the injection.

Further, while petitioner continued to document intermittent, infrequent complaints of left arm pain in her journals, she received no medical care or a diagnosis of a defined injury as the cause of that pain. Pain is a symptom—not a defined injury. *See Squadroni,* No. 16-1102V, 2019 WL 6525311, at *18. It is also unclear how resolved cellulitis would continue to cause pain. At a medical visit on February 27, 2014, several months after the subject flu vaccination and resolution of the cellulitis, examination of her left arm was normal with normal range of motion and 5/5 strength. Pet. Ex. 13 at 177-78; *see also* Pet. Ex. 16 at 1142-46. There was no mention of left arm pain, flu vaccine or cellulitis at her June 23, 2014 physical. Pet. Ex. 27 at 302-08. It was not until July of 2015 that petitioner presented to a physician with complaints of left arm pain, which she reported at that time began in or around July of 2015. *See* Pet. Ex. 22 at 102-12 (Dr. Minor records listing the date of onset as July 7, 2015); Pet. Ex. 27 at 177, 230 (PCP records from July 9, 2015 noting left arm pain present for 3-4 weeks; PCP records from October 14, 2015 documenting petitioner's complaint of chest and left arm pain present for 4 months). She then presented to an orthopedist for the first time in May of 2017—after retaining counsel—reporting a three-year history of severe left shoulder pain since receiving a vaccine. Pet. Ex. 6 a 1; Tr. 117. The subject flu vaccination was four, not three, years earlier. Other than cellulitis at the vaccination site in December of 2013 that was treated and resolved, petitioner's complaints and medical records following the November 21, 2013 flu vaccination fail to show any defined injury that would explain her ongoing intermittent complaints of left arm pain. Therefore, a determination of the

severity requirement cannot be made at this time. Petitioner will require an expert to address these issues.

It is further noted that petitioner was ordered both before and after the hearing to file complete medical records. She has not. Petitioner's journal entries discuss various doctor's visits with no corresponding medical record found in the records filed. More importantly, there are instances where the medical records reference diagnoses with no record of when, by whom, or the bases upon which those diagnoses were rendered.[23] Therefore, this Ruling is based on the record as it stands with petitioner having been provided numerous opportunities to make sure the record was complete. Petitioner submitted this case for Ruling based on the records relied on herein which show she suffered an infection on or about December 3, 2013 at the flu injection site treated with an antibiotic and steroids with resolution of the cellulitis. Thereafter, she complained of intermittent left arm pain at the injection site. It is not clear if and how these complaints are related to the flu vaccine or to the cellulitis she developed 12 days post-vaccination. As stated above, an expert is required to satisfy the severity requirement.

## V.    Conclusion

In sum, petitioner provided preponderant evidence that she suffered left arm pain with onset on or about December 3, 2013 when she developed an infection at the vaccination site approximately twelve days after her receipt of the flu vaccine on November 21, 2013. Once treated and resolved, she intermittently and infrequently complained of left arm pain at the vaccination site. However, the six-months severity requirement is not yet satisfied. Expert opinion is required to connect the November 21, 2013 flu vaccine to a defined injury that has caused her ongoing intermittent pain.

Further, as detailed above petitioner has not met her burden of proof to support a shoulder injury associated with the November 21, 2013 flu vaccine as she failed to provide preponderant evidence of onset within 48 hours of vaccination. *See* 42 C.F.R. § 100.3(c)(10). Thus, the SIRVA claim is **DISMISSED**. Petitioner may pursue an off-Table claim.

The parties shall confer and file a joint status report on whether they require a status conference, are willing to engage in settlement negotiations, and/or if they intend to file expert reports. In the event that experts are necessary, once retained, the parties are cautioned that the experts must rely on the facts as found in this Ruling. Should any expert base their opinion on facts not substantiated by this Ruling, their report will be disregarded. *See Burns*, 3 F.3d at 417.

Based on the foregoing, the following is hereby ORDERED:

> By no later than **Thursday, July 24, 2025**, the parties shall file a joint status report as detailed herein.

---

[23] For example, two years after petitioner's receipt of the November 21, 2013 flu vaccine, her PCP's office record for July 9, 2015 includes "Degenerative C-spine left rotator cuff pain unimproved…" and an assessment of left rotator cuff syndrome which had deteriorated. Pet. Ex. 27 at 230, 233-34. There were no records filed diagnosing petitioner with left rotator cuff syndrome.

**IT IS SO ORDERED.**

<u>**s/Mindy Michaels Roth**</u>
Mindy Michaels Roth
Special Master